UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JOSEPH LUKASZEK,

          Plaintiff,

    v.                              **DECISION AND ORDER**
                                      **05-CV-0831 (VEB)**

JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

          Defendant.

## Introduction

1.     Plaintiff Joseph Lukaszek challenges an Administrative Law

Judge's ("ALJ") determination that he is not entitled to disability insurance

benefits ("DIB") under the Social Security Act ("the Act").  Plaintiff alleges he

has been disabled since August 26, 1998, because of pain and limitations

from gout, osteoarthritis, and degenerative joint disease.  Plaintiff met the

disability insured status requirements of the Act at all times pertinent to this

claim.

## Procedural History

2.     Plaintiff filed an application for DIB on September 17, 1998, alleging

an onset of disability of August 26, 1998.  His application was denied initially,

and upon reconsideration.  Plaintiff filed a timely request for a hearing before

an ALJ, and on April 6, 1999, Plaintiff appeared and testified before ALJ Carl

E. Stephan.  The ALJ considered the case *de novo* and on June 9, 1999,

issued a decision finding that Plaintiff was not disabled.  Plaintiff requested

the Appeals Council review the ALJ's decision.  In the interim, Plaintiff filed a

second application for DIB on August 9, 2001, and under the second
application was initially determined to be disabled on March 13, 2001, with an
onset of disability date of April 24, 2000.  On January 24, 2002, the Appeals
Council granted Plaintiff's request for review of the ALJ's June 9, 1999,
decision, vacated that decision, and also reopened the State agency's
favorable disability determination pursuant to 20 C.F.R. §§ 404.987, 404.988,
and 404.989.  By its order dated April 5, 2002, the Appeals Council
consolidated both claims, and remanded the claims for further administrative
proceedings.  Plaintiff, his attorney, and a vocational expert appeared before
ALJ Stephan August 21, 2002.  After reconsideration of the evidence in
Plaintiff's record at the time of the June 9, 1999 decision, as well as new and
material medical and other evidence proffered by Plaintiff, on September 25,
2002, the ALJ issued a decision finding Plaintiff not disabled at any time
during the time frames relevant to his claims.  On June 3, 2005, the Appeals
Council denied Plaintiff's request for review.

3.      On July 5, 2005, Plaintiff filed a Civil Complaint challenging
Defendant's final decision and requesting the Court review the decision of the
ALJ pursuant to Section 205(g) and 1631(c) (3) of the Act, modify the
decision of Defendant, and grant DIB benefits to Plaintiff.[1]  The Defendant
filed an answer to Plaintiff's complaint on November 29, 2005, requesting the
Court to dismiss Plaintiff's complaint.  Plaintiff submitted a Memorandum of
Law in Support of Plaintiff's Complaint and Motion for Judgment on the

---

[1] The ALJ's September 25, 2002, decision became the Commissioner's final decision in this case
when the Appeals Council denied Plaintiff's request for review.

Pleadings on March 9, 2006.  On May 5, 2006, Defendant filed a Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings[2] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

## Discussion

**Legal Standard and Scope of Review:**

4.      A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  <u>See</u> 42 U.S.C. § 405(g), 1383 (c)(3); <u>Wagner v. Sec'y of Health and Human Servs.</u>, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if it is not supported by substantial evidence or there has been a legal error. <u>See</u>  <u>Grey v. Heckler</u>, 721 F.2d 41, 46 (2d Cir. 1983); <u>Marcus v. Califano</u>, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  <u>See</u> <u>Rutherford v. Schweiker</u>, 685 F.2d 60, 62 (2d Cir. 1982).

---

[2] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

5.      "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review."  Valente v. Sec'y of Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

6.      The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act.  See 20 C.F.R. § 404.1520, 416.920.  The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled.

7.      This five-step process is detailed below:

First, the [Commissioner] considers whether the claimant is currently engaged substantial gainful activity.  If he is not, the [Commissioner]

4

next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activeties.  If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also

Rosa v. Callahan, 168 F.3d 72,77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

8.     While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step.  See Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984). The final step of this inquiry is, in turn, divided into two parts.  First, the Commissioner must assess the claimant's job qualifications by considering his physical ability, age, education, and work experience.  Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

9.     In this case, the ALJ made the following findings with regard to factual information as well as the five-step process set forth above: (1) Plaintiff met the special insured status requirements of the Social Security Act

on August 26, 1998, the date the Plaintiff became unable to work, and continues to meet them through December 31, 2002 (R. at 20);[3]  (2) Plaintiff has not engaged in substantial gainful activity since August 26, 1998 (R. at 20); (3) The medical evidence establishes that Plaintiff has osteoarthritis and history of gout, but does not establish medical findings which meet or equal in severity the clinical criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4 (R. at 20); (4) Plaintiff's testimony was generally credible but did not support a basis for a finding of disability (R. at 20); (5) Plaintiff retains the residual functional capacity to frequently lift and carry from 20 to 25 pounds and occasionally carry from 26 to 50 pounds, sit for eight hours, stand for three hours at a time, walk for four hours in an eight-hour day, and for three hours at a time, cannot use his feet for repetitive movements such as pushing and pulling of leg controls, cannot bend, squat, crawl, climb, or reach, and has moderate restrictions regarding unprotected heights, being around dangerous moving machinery, and operating automotive equipment. Thus, the claimant can perform his past relevant sedentary and skilled work as a social welfare examiner (R. at 20-21); and (6) Plaintiff has not been under a disability with the meaning of the Act (R. at 21).  Ultimately, the ALJ determined Plaintiff was not entitled to a period of disability and disability insurance benefits as set forth in sections 216(i) and 223(d) of the Social Security Act (R. at 27).

---

[3] Citations to the underlying administrative are designated as "R."

**Plaintiff's Allegations:**

**The ALJ Failed to Consider Plaintiff's Combination of Impairments When Determining His Residual Functional Capacity:**

10.     Plaintiff's first challenge to the ALJ's decision is that he failed to consider Plaintiff's combination of impairments when determining his residual functional capacity.  See Plaintiff's Brief, p. 2; see also 20 C.F.R. § 404.1545(d); 20 C.F.R. § 404.15692(c).  Specifically, Plaintiff alleges he has both physical and mental diagnoses that, in combination, cause exertional and nonexertional limitations.  See Plaintiff's Brief, pp. 7-8.  Plaintiff complains especially that the ALJ did not consider the psychological evaluation report of Dr. Charles Kennedy, a Veterans' Administration psychologist, which stated Plaintiff suffered from Post Traumatic Stress Disorder (PTSD) (R. at 349-350).  Thus, according to Plaintiff, the ALJ committed reversible error.

        The Court disagrees with Plaintiff's claim that the ALJ failed to properly consider the psychological evaluation of Dr. Kennedy.  Prior to Plaintiff's assessment for PTSD by Dr. Kennedy, he did not complain of, or seek treatment for, any behavioral or psychological impairment except alcoholism, which Plaintiff had controlled for over 15 years by daily attendance at Alcoholics Anonymous (AA) meetings (R. at 449).   From the record, it is clear that Dr. Kennedy began following Plaintiff for PTSD only beginning November 26, 2001 (R. at 257).  Dr. Kennedy continued assessing Plaintiff for PTSD on February 19, 2002, March 12, 2002, May 20, 2002, and May 31, 2002, using a psychological battery of self-report measures including

the Mississippi Scale for Combat related Stress, the Keane PTSD Subscale of the MMPI2, the Dissociative Experiences Scale, and the Back Depression inventory, as well as behavioral observations (R. at 254, 256, 257).  On August 7, 2002, Dr. Kennedy issued his evaluation that Plaintiff suffered from PTSD as a result of his service in Vietnam from May 1967, through May 1968 (R. at 349-250).  Dr. Kennedy noted Plaintiff's psychological tests and interviews revealed a chronic and persistent pattern of mild distress that impacted Plaintiff's ability to conduct normal daily activities (R. at 350).  He rated Plaintiff's Global Assessment of Function (GAF) at 61, suggesting Plaintiff had some mild symptoms, such as depressed mood and mild insomnia, OR some difficulty in social, occupational, or school functioning; but, he generally functioned well and had some meaningful interpersonal relationships [4].  Id.

Further, in Plaintiff's Disability Report of September 27, 1998, he claimed only the impairments of gout, a left knee problem, and osteoarthritis (R. at 83).  He reported broad and varied activities of daily living, including cooking, shopping, caring for his invalid mother, reading, daily attendance at AA meetings, and regular social visits (R. at 93).  Plaintiff reported no on-the-job problems other than those caused by his gout, left knee impairment, and osteoarthritis (R. at 94).

At his first hearing before the ALJ on April 6, 1999, Plaintiff claimed only a left knee impairment and arthritis (R. at 436-457).  While the ALJ

---

[4] The Global Assessment of Functioning (GAF) is a numeric scale (0 -100) used by mental health professionals to rate the social, occupational, and psychological functioning of adults.  See http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

questioned Plaintiff about his combat service in Vietnam, Plaintiff did not

report any psychological condition or symptoms stemming from that service

(R. at 448-449).  At his second hearing before the ALJ on August 21, 2002,

Plaintiff again claimed to be impaired only by gout, arthritis, degenerative joint

disease, and drowsiness from medication (R. at 462-516).  Under questioning

by both the ALJ and Plaintiff's attorney about his impairments, symptoms and

treatments, Plaintiff did not mention any mental impairment, or mental

limitation.  Id.

On May 19, 2004, a representative of the Department of Veterans

Affairs (DVA) provided an explanation to Plaintiff about his ten percent

disability rating because of PTSD, and noted:

> Treatment reports, Veterans Administration Center Albany, from
> January 21, 1986 through May 6, 2004, shows recent treatment for
> PTSD.  An assessment from Dr. Kennedy on August 7, 2002 gives
> a diagnosis of PTSD.  The examination showed you were alert,
> cooperative, and fully oriented.  There was no evidence of
> hallucinations, delusions, looseness of association, or flight of
> ideas.  There was no suicidal or homicidal ideation or intention.
> You reported occasional nightmares, efforts to avoid war
> experiences, memory problems, sleep difficulties, episodic anger
> outbursts, mood shifts, and emotional numbness.  The interview
> revealed a chronic and persistent pattern of mild distress…
>
> An evaluation of 10 percent is assigned from October 29, 1999.  An
> evaluation of 10 percent is granted whenever there is occupational
> and social impairment due to mild or transient symptoms which
> decrease work efficiency and ability to perform occupational tasks
> only during periods of significant stress; or symptoms controlled by
> continuous medication…
>
> The evidence does not show that this condition presents such an
> exceptional or unusual disability picture with related factors such as
> marked interference with employment or frequent periods of
> hospitalization as to render impractical the application of regular
> scheduler standards.

(R. at 379).

While this explanation of the DVA's assessment of Plaintiff's PTSD impairment was received by the Appeals Council after the ALJ's decision of September 25, 2002, it is clear to the Court that the the Appeals Council considered the opinion of Dr. Kennedy to be an accurate impression of the effect of PTSD on Plaintiff's daily function.  Thus, while the ALJ had Dr. Kennedy's evaluation in his possession at the time of his decision, the opinion reflected such minimal findings and mild impairment because of PTSD that, coupled with Plaintiff's failure to complain about behavioral or mental limitations, and his attorney's failure to question or assert such limitations, the ALJ cannot be faulted for failing to assume that Plaintiff's diagnosis of PTSD caused more than a mild effect on his day-to-day functioning.

Plaintiff's diagnosis of PTSD, even with his acknowledged severe impairments of gout and osteoarthritis, do not prove Plaintiff is disabled within the meaning of the Act.  See 42 U.S.C. § 423 (d) (2) (A).  Per the Act, an individual is considered to be under a disability "only if he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy…"  Id.  Based on the ALJ's consideration of the evidence of record, including all documents identified in the record, Plaintiff's testimony at two hearings, and the ALJ's observations of Plaintiff, the ALJ concluded Plaintiff could perform a wide range of sedentary to light work, and

could return to his past relevant sedentary employment as a welfare claims examiner (R. at 20-21).  Thus, the Court finds the ALJ considered all of Plaintiff's impairments and limitations contained in the record, and properly found him not disabled within the meaning of the Act.

### The ALJ *Failed to Give Appropriate* Weight to the Opinions of Plaintiff's Treating Physicians:

11.    Plaintiff's second challenge to the ALJ's decision is that he did not give controlling weight to the opinions of Plaintiff's treating medical specialists, specifically Doctors Charles Adomfeh, M.D., and Charles Kennedy, Ph. D.  See Plaintiff's Brief, pp. 2, 9-10.  Instead, Plaintiff claims the ALJ substituted his own opinion for that of the medical experts.  See Plaintiff's Brief, p. 10.  Plaintiff asserts that since Dr. Adomfeh's findings and observations were substantially consistent with the findings and observations of consultative examiner Dr. Amelita Balagtas, the opinion of Dr. Adomfeh with regard to Plaintiff's limitations and his residual functional capacity, should have been controlling.  See Plaintiff's Brief, p. 9.  Further, Plaintiff claims the ALJ failed to address Dr. Kennedy's opinion of Plaintiff's mental health status at all.  See Plaintiff's Brief, pp. 9-10.  Thus, because the ALJ did not properly consider the combination of Plaintiff's mental and physical impairments, his decision is not supported by the substantial evidence of record.  See Plaintiff's Brief, p. 10.

According to the "treating physician's rule,"[5] the ALJ must give controlling weight to the treating physician's opinion when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(d)(2); see also Green-Younger v. Barnhart, No. 02-6133, 2003 WL 21545097, at *6 (2d Cir. July 10, 2003); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).

Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances.  Under  C.F.R. § 404.1527(d)(1)-(6), the ALJ should consider the following factors when determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court.  See de Roman, 2003 WL 21511160, at *9 (citing C.F.R. § 404.1527(d)(2); see also Shaw, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Having reviewed the evidence at issue, this Court detects no reversible error in the ALJ's treatment of the opinion of Plaintiff's treating physician, Dr. Adomfeh, or the DVA psychologist, Dr. Kennedy.  Rather, the

---

[5] "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. SS 404.1527 detailing the weight to be accorded a treating physician's opinion." de Roman v. Barnhart, No.03-Civ.0075(RCC)(AJP), 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

ALJ's decision reflects his extensive evaluation of all the medical evidence in the record developed from the date of Plaintiff's alleged onset of disability on August 26, 1998, through the date of the ALJ's decision on September 25, 2002 (R. 14-21).  The medical evidence includes treatment notes, evaluations of Plaintiff's progress, and test results (R. at 106-516). While much of the medical record provided by Dr. Adomfeh is consistent with the records of Plaintiff's other treating and examining physicians, his August 2002 opinion of Plaintiff's physical capacities is unsupported by his own records and the records of the other physicians (R. at 407-408). There is simply no medical evidence provided by Dr. Adomfeh that suggests Plaintiff's medical condition had deteriorated so severely that by August 2002 he could not use his hands for any repetitive motion.  With respect to the PTSD assessment of Dr. Kennedy, the doctor opined Plaintiff has "mild distress that impacts on the patient's ability to conduct normal daily activities" (R. at 350).  He also noted Plaintiff participated in a "VVRP group"[6], continued frequent attendance at AA meetings, and would be offered individual psychotherapy if needed.  Id.  It is unclear from the record if Plaintiff ever established a treating relationship with Dr. Kennedy, or with any other mental health professional who could be classified as a treating source, to treat symptoms of PTSD.  Thus, for the purpose of Plaintiff's challenge to the ALJ's decision, Dr. Kennedy cannot be

---

[6] The Veterans Viêt Nam Restoration Project (VVRP) is a small 501(c) (3) non-governmental organization (NGO). Its stated mission is to send teams of veterans to Viêt Nam to reconcile with the Vietnamese and to heal the emotional and spiritual wounds suffered in the war. Team members work alongside the Vietnamese in undertaking humanitarian projects such as the construction of clinics, houses for disabled veterans, vocational training centers, and kindergarten classrooms.  See http://www.vvrp.org.

considered a "treating physician," but served more in the role of a consulting examiner. See 20 C.F.R. 404.1527(4)(d)(2).

On May 1, 1998, Plaintiff was diagnosed by his treating physician, Dr. Joel Koslow, with severe osteoarthritis of his left knee (R. at 121-122). The doctor prescribed anti-inflammatory medication, and recommended Plaintiff stay off work from his machine maintenance job with the United States Postal Service (USPS) until May 11, 1998 (R. at 121). Plaintiff followed up with Dr. Koslow, who then recommended he stay off work until July 25, 1998 (R. at 123).

On July 22, 1998, Plaintiff underwent a surgical consultation with Dr. John Albrigo (R. at 106-107). In Dr. Albrigo's report to Dr. Koslow, he noted Plaintiff complained of recurrent left knee swelling and pain, but could remember no specific trauma (R. at 106). Upon examination, the doctor found Plaintiff had a full range of motion in the knee, but noted discomfort with marked flexion in the popliteal region, and tenderness to palpation at the medial joint line. Id. The knee was stable to all stress tests, and alignment appeared normal. Id. Dr. Albrigo observed x-rays of Plaintiff's knee appeared normal, with no joint space narrowing, evidence of loose body, or other abnormality. Id. The doctor suspected a tear in the medial meniscus of the left knee and recommended arthroscopic surgery (R. at 107).

Plaintiff was again examined by Dr. Koslow on August 25, 1998 (R. at 116-117). Dr. Koslow certified Plaintiff's absence from work under the Family and Medical Leave Act (FMLA) for several months longer (R. at 116).

On September 15, 1998, Plaintiff was examined by Dr. Nhe Le at the Veterans Administration Medical Center (VAMC) in Albany, New York (R. at 157-158).  Plaintiff disclosed a history of gout in his foot, and complained of tenderness and pain in his left knee, and both shoulders (R. at 157).  Plaintiff's physical examination was unremarkable (R. at 158).  Dr. Le noted that while Plaintiff was slightly tender in both shoulders, he had no edema or swelling, and no limitation of range of motion in his shoulders.  Id.  The doctor opined Plaintiff might have degenerative joint disease in his shoulders, and referred him to an orthopedic specialist for his knee (R. at 157-158).

On October 13, 1998, Plaintiff was examined by consultative examiner, Dr. Amelita Balagtas (R. at 124-125).  Dr. Balagtas noted Plaintiff's gait and station were normal (R. at 124).  He needed no help getting on and off the examining table.  Id.  The examination of his cervical spine revealed normal results with no pain or spasm.  Id.  Upon examination of his upper extremities, he had full range of motion of his shoulders, elbows, forearms, and wrists (R. at 125).  The doctor noted Plaintiff complained of pain at extreme forward elevation of both shoulders.  Id.  Biceps and triceps strength was 5/5 bilaterally.  Id.  Dr. Balagtas found no muscle atrophy or sensory abnormalities in Plaintiff's upper extremities.  Id.  Grip strength was 5/5 bilaterally, and Plaintiff could make a fist and use his fingers for fine manipulation.  Id.  Examination of Plaintiff's spine revealed normal flexion, extension, lateral extension, and lateral rotation of the lumbar spine, without tenderness or spasm.  Id.  Straight leg raising was negative bilaterally, and

reflexes were physiological and equal.  Id.  Quad muscle strength was 5/5

bilaterally.  Id.  Upon examination of Plaintiff's lower extremities, the doctor

noted full range of motion of his hips, knees and ankles.  Id.  Plaintiff

complained of pain in his left knee with extreme flexion, and Dr. Balagtas

noted some tenderness over the medial aspect of the knee.  Id.  There was

no evidence of effusion or inflammation of Plaintiff's knees, and there was no

instability of his knees or ankles.  Id.  Dr. Balagtas opined Plaintiff had

probable osteoarthritis of his left knee.  Id.  In her medical source statement,

she noted he would have limitations in activities that required squatting,

kneeling, lifting, prolonged standing, walking, and stair climbing.  Id.

        The day after Plaintiff's examination by Dr. Balagtas, October 14,

1998, Dr. Koslow completed a questionnaire for the New York State Office of

Temporary and Disability Assistance Division of Disability Determination (R.

at 108-114).  Dr. Koslow's response to the questionnaire was based on the

results of his last examination of Plaintiff on August 25, 1998 (R. at 108).  The

doctor opined Plaintiff had severe osteoarthritis of the left knee which caused

pain.  Id.  Dr. Koslow assessed Plaintiff as being able to lift and carry up to 20

pounds, with standing and walking limited to two hours per days, and with no

limitations on sitting or pushing or pulling with the hands or feet (R. at 110-

111).

        On October 16, 1998, Plaintiff was examined by a VAMC

orthopedic surgeon, Dr. Carl Wirth (R. at 155).  The doctor noted Plaintiff had

multiple subjective complaints with no objective findings.  Id.  Physical

examination of Plaintiff's upper and lower extremities revealed normal results. Id. Dr. Wirth opined the lack of medical findings in Plaintiff's physical examination and x-rays compelled no orthopedic surgical management. Id.

State agency physician, Dr. Carol Wakeley, completed a Residual Physical Functional Capacity Assessment on October 23, 1998 (R. at 127-134). Dr. Wakeley reviewed Plaintiff's medical records and assessed he was capable of performing a full range of light work (R. at 133).

On October 30, 1998, Plaintiff was examined by his treating physician, Dr. Le (R. at 155). Dr. Le noted Plaintiff's complaints of diffuse aches and pains, and opined he might have early-stage inflammatory arthritis. Id. The doctor prescribed naproxen. Id.

Plaintiff was evaluated by VAMC consulting rehabilitation physician, Dr. Todd Jorgenson, on November 10, 1998 (R. at 143-145). Prior to the consultation, the doctor requested x-rays of Plaintiff's shoulders, hips and pelvis, and hands (R. at 144). The doctor noted all x-rays were normal, with no arthritic changes, except for a small bony spur on the distal portion of the first metacarpophalangeal joint of the left hand. Id. Upon examination, Dr. Jorgenson found tenderness to palpation over Plaintiff's subacromial bursa and bicipital tendon bilaterally. Id. He also observed Plaintiff had increased pain with passive and active abduction beyond 90 degrees in both shoulders, and pain with range of motion testing of the first metacarpophalangeal joint of the left hand. Id. The rest of Plaintiff's physical examination was unremarkable. Id. Dr. Jorgenson's impression was that Plaintiff had

subacromial bursitis in his shoulders bilaterally, bicipital tendinitis bilaterally, and arthritis at the first metacarpophalangeal joint of his left hand.  Id.  The doctor advised Plaintiff to avoid overhead activities, anything with abduction or forward flexion over 90 degrees, and lifting more than 10 pounds with the upper extremity in the forward flexed position (R. at 145).  Dr. Jorgenson prescribed a pain injection in Plaintiff's right shoulder, and Plaintiff claimed immediate pain relief.  Id.  Dr. Jorgenson recommended a program of physical therapy, and cleared Plaintiff for light duty work.  Id.

Dr. Jorgenson again examined Plaintiff on December 1, 1998 (R. at 274-277).  The results of this second examination were essentially the same as the results of the examination on November 10, 1998 (R. at 275-276).  Dr. Jorgenson cleared Plaintiff for light duty work (R. at 277).

On December 11, 1998, Plaintiff was evaluated for physical therapy and received instruction in a home exercise program (R. at 141-142).

Dr. Jorgenson examined Plaintiff for the third time on December 14, 1998 (R. at 139-140).  Plaintiff reported his right upper extremity was significantly better, and he hoped to have a pain injection in his left shoulder (R. at 139).  Upon examination, the doctor noted Plaintiff had full range of motion bilaterally in his upper extremities.  Id.  Plaintiff was tender to palpation over the subacromial bursa on the left, but the doctor found no tenderness on the right.  Id.  Dr. Jorgenson noted a positive impingement sign on the left, but none on the right.  Id.  The doctor's impression was subacromial bursitis of the left shoulder.  Id.  He treated Plaintiff with an injection in the left shoulder,

and noted there appeared to be no reason that Plaintiff should be on disability until August 1999 (R. at 139-140).

Plaintiff was examined by treating physician, Dr. Le, on December 15, 1998 (R. at 137-138).  Dr. Le noted Plaintiff reported a decrease of pain in his joints, but especially in his shoulders (R. at 137).  Plaintiff reported no side effects from naproxen.  Id.  He told the doctor he was caring for his invalid mother, and was planning to take two college courses.  Id.  Dr. Le's impression was that Plaintiff's arthritis and tendinitis had improved with physical therapy, exercise, and naproxen (R. at 138).

On January 6, 1999, Plaintiff was examined by his VAMC physical therapist (R. at 135-136).  Upon examination, the only significant finding was minor tenderness along the left subacromial region and left bicipital tendon region (R. at 135).  Plaintiff was discharged from physical therapy to a home exercise program, as all goals of his physical therapy program had been met (R. at 135-136).

On March 19, 1999, Plaintiff underwent an x-ray study of his left knee (R. at 288).  The study failed to show any bony or joint abnormalities, and there were no loose bodies, fracture, or dislocation.  Id.  The radiologist opined Plaintiff's left knee was grossly normal.  Id.

Plaintiff was also examined by a VAMC rheumatologist on March 19, 1999 (R. at 165-166).  The doctor advised him to discontinue naproxen and return for a joint tap to determine if he had gouty arthritis (R. at 166).

On March 23, 1999, Plaintiff was again examined by treating physician Dr. Le (R. at 168-169).  The examination was unremarkable, but the doctor noted Plaintiff was applying for disability, and took care of his mother (R. at 168).

In anticipation of beginning a new session of physical therapy treatments, Plaintiff was examined by VAMC rehabilitation physician, Dr. Joey Roque, on May 3, 1999 (R. at 279-280).  Upon examination, Dr. Roque noted no swelling or erythema in Plaintiff's shoulders (R. 279).  Range of motion of the right shoulder was within functional limits, and Plaintiff was able to tolerate the full range of motion with forward flexion, abduction, external rotation, and internal rotation.  Id.  Range of motion of the left shoulder was also within functional limits, although the doctor observed Plaintiff complained of pain at the end of the range of motion, particularly with forward flexion and abduction. Id.  Plaintiff was tender over the anterior joint region.  Id.  Dr. Roque's impression was that Plaintiff had chronic subacromial bursitis of the left shoulder (R. at 280).  The doctor recommended another course of physical therapy, but did not believe Plaintiff's complaints were significant enough to warrant pain injections.  Id.  Dr. Roque recommended Plaintiff restart naproxen.  Id.

On May 5, 1999, two days after his examination by Dr. Roque, Plaintiff called both Dr. Roque and the physical therapist to cancel all physical therapy sessions (R. at 279, 280).  He reported his left shoulder pain had resolved with naproxen.  Id.

Plaintiff was treated by nurse practioner, Noelle Farrell, for bleeding hemmoroids on May 28, 1999 (R. at 278-279).  She instructed Plaintiff to discontinue naproxen and begin taking salsalate for pain (R. at 278).

On June 25, 1999, Plaintiff was examined by rheumatologist, Dr. Patrick Marzkowski (R. at 174-175).  The doctor noted Plaintiff had pain with range of motion of his right hip, but Plaintiff's hip x-ray was unremarkable (R. at 175).  The rest of Plaintiff's examination revealed normal results (R. at 174).  The doctor prescribed Tylenol and salsalate for pain (R. at 175).

On July 16, 1999, Plaintiff's new treating physician at the VAMC, Dr. Tonneau, performed a thorough examination of Plaintiff in anticipation of completing a Physical Capacities Evaluation (R. at 170-173).  The examination revealed essentially normal results, but the doctor thought Plaintiff might have early-stage degenerative joint disease (R. at 172).  Dr. Tonneau assessed Plaintiff as capable of sitting for eight hours in a work-day, standing and walking for a total of four hours in a work-day, having a need to change positions frequently, able to lift 26-50 pounds occasionally, 21-25 pounds frequently, and less than 20 pounds continuously (R. at 170).  The doctor did not restrict the use of Plaintiff's hands, nor did he assign any postural or activity restrictions (R. at 171).  Dr. Tonneau assessed Plaintiff's pain as mild.  Id.

On July 27, 1999, the medical officer for the USPS, Dr. Thomas Lawford, cleared Plaintiff for light-duty work (R. at 179-181).  While Dr.

Tonneau did not assign postural limitations, Dr. Lawford noted Plaintiff should

not bend, crawl, squat, climb or reach (R. at 180).

On September 22, 1999, Plaintiff was again cleared for light-duty

work by Dr. Lawford (R. at 186-188).   However, on September 27, 1999,

Plaintiff was advised by a USPS personnel officer that there were no light

duty assignments available compatible with his postural restrictions (R. at

190).

Dr. Koslow completed a Medical Report for General Relief,

Medicaid, and Temporary Assistance for Needy Families for the

Commonwealth of Virginia at Plaintiff's request on October 18, 1999 (R. at

198).  Dr. Koslow noted he examined Plaintiff on October 8, 1999, and

anticipated Plaintiff's disability would continue for two months.  Id.  He

diagnosed severe osteoarthritis of the left knee, and stated Plaintiff's

treatment plan included anti-inflammatory medication and arthroscopic

surgery.  Id.

Plaintiff was examined by treating orthopedic surgeon, Dr. John

Albrigo, on October 21, 1999 (R. at 206).  Upon examination, Dr. Albrigo

noted Plaintiff's gait pattern was normal.  Id.  Plaintiff had mild restriction of

motion of the left knee, and tenderness along the medial joint line.  Id.  Dr.

Albrigo opined Plaintiff might have a tear of the medial meniscus of the left

knee, rather than degenerative arthritis, and recommended an MRI study.  Id.

On October 28, 1999, Plaintiff underwent an MRI study of his left

knee (R. at 201).  The radiologist's impression was that Plaintiff had a small

tear of the inferior surface of the posteromedial medial meniscus and minimal apical tears of the posterior horn of the medial meniscus.  Id.

Plaintiff underwent arthroscopic surgery on December 29, 1999, for his medial meniscus tears. While the reports of this surgery is not included in the record, notes from his first post-operative visit with Dr. Albrigo are available (R. at 203).  Dr. Albrigo reported the surgery to repair the tears in Plaintiff's medical meniscus had been completed.  Id.  Upon examination, incisions were benign, and there was mild fullness of the knee, but no calf swelling or tenderness.  Id.  The doctor observed Plaintiff's gait pattern was excellent.  Id.  Dr. Albrigo anticipated Plaintiff could return to full employment duties approximately three weeks after this examination.  Id.

On April 7, 2000, Dr. Lawford again cleared Plaintiff to return to a light-duty assignment with the USPS (R. at 210-215).  Plaintiff was advised by a personnel officer that no light-duty assignment compatible with his postural restrictions was available (R. at 218).

Dr. Lawford requested Dr. Koslow clarify Plaintiff's work restrictions on April 28, 2000 (R. at 222-223).  Dr. Koslow prepared a note on May 16, 2000, stating Plaintiff had arthritis in his knees and bursitis in both shoulders and was unable to do any kneeling, bending, reaching, stretching, or climbing (R. at 224).

On May 18, 2000, Dr. Albrigo sent a letter to Plaintiff stating that the surgery on Plaintiff's left knee had been successful, and that the doctor was unaware of any problems Plaintiff had with his shoulders or his right knee (R.

at 230).  Dr. Albrigo noted he was "quite surprised to learn that Dr. Koslow has discussed total knee replacement surgery with you."  Id.  The doctor advised Plaintiff he could "find no basis for consideration of disability retirement regarding your left knee."  Id.

Dr. Lawford clarified Plaintiff's work restrictions with Dr. Koslow on May 19, 2000 (R. at 226).  Dr. Koslow restricted Plaintiff from kneeling, climbing, reaching, or stretching.  Id.  He removed the restrictions of standing and lifting objects weighing more than 20 pounds.  Id.  On May 22, 2000, Dr. Lawford again cleared Plaintiff for light-duty work with the postural restrictions assessed by Dr. Koslow (R. at 227-228).

On May 3, 2000, Plaintiff was advised by the United States Office of Personnel Management that his application for disability retirement had been approved (R. at 232-234).

Plaintiff was examined by his new treating physician at the VAMC, Dr. Charles Adomfeh, on August 14, 2000 (R. at 272).  The examination was mostly unremarkable, although the doctor noted tenderness in the cervical spine and back area.  Id.  Plaintiff also complained of tenderness during range of motion tests on both shoulders, and his left knee.  Id.  Dr. Adomfeh prescribed a muscle relaxant.  Id.

Plaintiff followed up with Dr. Adomfeh on January 3, 2001, when he complained of an ear infection (R. at 270-271).  The doctor noted Plaintiff had mild to moderate tenderness in the lumbosacral area, and mild to moderate tenderness with a range of motion test of his left knee (R. at 271).  The doctor

recommended Plaintiff continue with his medications, and improve his diet and exercise program.  Id.

On July 6, 2001, Dr. Adomfeh again examined Plaintiff (R. at 266). The examination was mostly unremarkable, although the doctor noted Plaintiff had pain with range of motion tests on his hips and knees.  Id.

Plaintiff underwent a chest x-ray on July 16, 2001 (R. at 287).  The radiologist noted Plaintiff's heart was normal, his lungs were clear, and he had mild degenerative changes in his thoracic spine.  Id.

On August 31, 2001, Plaintiff was examined by Dr. Adomfeh (R. at 265).  The examination was unremarkable, and Plaintiff reported no new symptoms.  Id.

Dr. Adomfeh again examined Plaintiff on October 31, 2001 (R. at 257-258).  Plaintiff reported he felt fine and had no new symptoms (R. at 257).  The doctor recommended Plaintiff continue with his current medications, diet, and exercise program (R. at 258).

On February 11, 2002, Dr. Adomfeh completed a Physical Capacities for Plaintiff (R. at 243-244).  The doctor assessed Plaintiff as capable of sitting for eight-hours in a work-day, standing and/or walking continuously for three hours in a work-day, and needing the opportunity to change position frequently (R. at 243).  Dr. Adomfeh noted Plaintiff could occasionally lift and carry 26-50 pounds, frequently lift and carry 21-25 pounds, and continuously lift and carry items weighing 20 pounds or less.  Id. No restrictions were placed on Plaintiff's repetitive use of his hands, although

the doctor restricted Plaintiff from using his feet for repetitive movements as in pushing and pulling of leg controls (R. at 244).  Dr. Adomfeh assessed Plaintiff as moderately restricted from working at unprotected heights, around moving machinery, or driving automotive equipment.  Id.  The doctor opined Plaintiff's pain level was mild.  Id.

On May 20, 2002, Plaintiff was examined by his new treating physician at the VAMC, Dr. Maria Castro (R. at 254-255).  The examination was unremarkable and Dr. Castro noted Plaintiff's symptoms of degenerative joint disease were controlled with his current medications (R. at 255).

Dr. Adomfeh examined Plaintiff on August 6, 2002 (R. at 356-358). The doctor noted Plaintiff's hypothyroidism, hyperlipidemia, and generalized muscle and joint pain (R. at 356).  The doctor noted Plaintiff had pain in his left knee, shoulder, and neck with range of motion tests (R. at 358).  Dr. Adomfeh recommended weight loss through a diet and exercise plan, and that Plaintiff continue with his current medications (R. at 357-358).

On August 19, 2002, Dr. Adomfeh completed another Physical Capacities Evaluation for Plaintiff (R. at 361-362).  While this evaluation was similar to the one completed On February 11, 2002, Dr. Adomfeh restricted Plaintiff from using his hands for any repetitive motions, and assessed Plaintiff's level of pain as moderate (R. at 362).

Plaintiff was examined by Dr. Castro on May 12, 2003 (R. at 424-426).  She noted Plaintiff's diagnoses of multiple site degenerative joint disease, hyperlipidemia, and hypothyroidism (R. at 424).  Plaintiff reported no

acute problems, and the doctor observed that he was well and stable (R. at 424).

On May 21, 2003, Plaintiff was examined for skin disease at the VAMC by Dr. Richard Blaber (R. at 412-414).  During the examination, Dr. Blaber noted Plaintiff had good strength in his hands, despite his reported arthritis (R. at 413).  The doctor also observed Plaintiff had "preserved" motion at the wrists and elbows, shoulders, neck, and ankles.  Id.  Dr. Blaber noted Plaintiff's knees were without effusion, his joint lines were non-tender, and he was able to get on and off the examining table without difficulty.  Id.  The doctor also observed Plaintiff was anxious during the examination (R. at 414).

Plaintiff was examined by a consulting rheumatologist, Dr. Betsy Fuchs, on November 16, 2003 (R. at 390-392).  He reported pain in his ankles, knees, elbows, wrists, shoulders, low back, and hands (R. at 390).  Upon examination, Dr. Fuchs noted Plaintiff had no pain upon palpation of his cervical, thoracic, or lumbar spine (R. at 391).  His shoulders had a good range of motion with a weakly positive impingement sign on the right.  Id.  Plaintiff's left shoulder had some decrease in external rotation with a "weakly positive" impingement sign.  Id.  His elbows had a suggestion of minimal synovitis bilaterally, but his wrists had no obvious synovitis.  Id.  Plaintiff's hands were tender to palpation.  Id.  His hips had good range of motion.  Id.  Dr. Fuchs noted Plaintiff's knees had crepitus bilaterally with no erythema,

warmth, or effusion.  Id.  Plaintiff's ankles had good range of motion.  Id.  Dr. Fuchs delayed a diagnosis pending x-rays and other tests (R. at 392).

On November 21, 2003, Dr. Adomfeh completed another Physical Capacities Evaluation for Plaintiff that was the same as the evaluation completed in August 2002 (R. at 361-362, 408).

Dr. Fuchs diagnosed Plaintiff with probable subacromial bursitis of both shoulders on September 20, 2004 (R. at 372).  She recommended heat and ultrasound therapy to both subacromial bursas twice a week for four weeks.  Id.  This is the last medical report in Plaintiff's record.

Based on the medical evidence provided by Plaintiff's treating, and consulting physicians, the ALJ assessed that Plaintiff retained the residual functional capacity to frequently lift and carry from 20 to 25 pounds, to occasionally lift and carry from 26 to 50 pounds, to sit for eight hour in an eight-hour work day, stand for three hours at a time, and walk for a total of four hours in an eight-hour work day, but no more than three hours at a time (R. at 20).  The ALJ further assessed that Plaintiff could not use his feet for repetitive movements such as pushing and pulling of leg controls, and could not bend, squat, crawl, climb or reach (R. at 21).   Based on Plaintiff's doctors' recommendations, the ALJ noted Plaintiff had moderate restrictions regarding working at unprotected heights, and working around moving machinery or with automotive equipment.  Id.  Thus, based on the totality of evidence presented by Plaintiff's treating physicians, independent medical examiners, test results, and the opinion of a State agency examining physician, the ALJ

found Plaintiff retained the residual functional capacity to perform his past relevant sedentary skilled work as a social welfare examiner.  Id.

As noted above, Plaintiff disputes this finding, and alleges the ALJ substituted his lay opinion for the opinions of Plaintiff's treating professionals. See Plaintiff's Brief, pp. 9-10.  However, the evidence shows Plaintiff's neurological tests and motor, sensory, and strength examinations were consistently normal, or showed minimal findings (R. at 106-431).  As an example, Plaintiff was consultatively examined in October 1998 by an orthopedic specialist, Dr. Amelita Balagtas (R. 124-125).  The results of Plaintiff's examination were essentially normal, although the doctor's impression was that Plaintiff might have arthritis in his left knee (R. at 125).

Also in October 1998, Plaintiff was consultatively examined by Dr. Carl Wirth, a VAMC orthopedic surgeon (R. at 155).  Dr. Wirth noted that while Plaintiff had multiple subjective complaints, his examination and tests revealed essentially normal findings.  Id.

When Plaintiff was examined by Dr. Todd Jorgenson in November 1998, the doctor noted little in the way of objective findings were revealed during Plaintiff's work-up, including tests and x-rays (R. at 143).  The most significant finding during Plaintiff's examination by Dr. Jorgenson was tenderness to palpation over the subacromial bursa and bicipital tendon in both shoulders (R. at 144).  Dr. Jorgenson assessed Plaintiff as capable of immediately returning to light-duty work, with only minor range of motion restrictions (R. at 145).

Plaintiff was examined by a rehabilitation physician, Dr. Roque, in May 1999 (R. at 279-280).  Again, Plaintiff's physical examination revealed little in the way of objective findings (R. at 279).  Plaintiff complained of pain at the end of range of motion tests and tenderness over the anterior joint region.  Id.  Dr. Roque suggested only conservative treatment, including NSAIDS and physical therapy, and within two days, Plaintiff called the doctor to cancel all physical therapy sessions as he reported the pain in his shoulders had resolved (R. at 280).

In August 2000, Plaintiff's treating physician, Dr. Adomfeh, reported Plaintiff's main problem as pain in his shoulders and knees (R. at 272-273).  Plaintiff's physical examination was normal except for complaints of tenderness and pain at the end of range of motion tests in both shoulders and left knee (R. at 272).

By February 2002, Dr. Adomfeh completed a Physical Capacities Evaluation, wherein he assessed Plaintiff as capable of performing most of the range of light work, only excluding Plaintiff from performing repetitive movements such as pushing or pulling with his feet, postural limitations including bending, squatting, crawling, climbing, and reaching, and working around unprotected heights, moving machinery, and automotive equipment (R. at 243-244).  While Dr. Adomfeh suggested further restrictions to Plaintiff's physical capacities in August 2002, and November 2003, including restrictions to repetitive hand movements, the doctor failed to provide any

objective medical evidence that such restrictions were necessary (R. at 361-362, 408-409).

Plaintiff's October 2003 examination by Dr. Fuchs revealed few medical findings, and the doctor delayed a diagnosis until she received the results of a battery of tests, including x-rays and blood tests (R. at 391-392). When Dr. Fuchs presented her diagnosis in September 2004, she opined Plaintiff had subacromial bursitis and prescribed heat and ultrasound treatments to Plaintiff's subacromial bursas twice weekly for four weeks (R. at 372).

Plaintiff asserts the ALJ improperly disregarded the opinion of Plaintiff's treating physician, Dr. Adomfeh, and the exertional and non-exertional restrictions established in the doctor's August 2002 Physical Capacities Evaluation, and claims the restrictions would preclude him from performing even the requirements of sedentary work.  See Plaintiff's Brief, p. 10.

The Court disagrees with Plaintiff's assertion that the ALJ disregarded the opinion of Dr. Adomfeh.  In his decision, the ALJ reviewed carefully and at length the important medical assessments, opinions, and conclusions of many of Plaintiff's treating and examining physicians, including Dr. Adomfeh (R. at 15-20).  As an example, Plaintiff began treatment with Dr. Adomfeh on August 14, 2000 (R. at 272-273).  The examination revealed few medical findings, except that Plaintiff complained of tenderness to palpation in his back, and pain on range of motion testing of his left knee (R. at 18, 272-

273).  In February 2002, Dr. Adomfeh completed a Physical Capacities Evaluation for Plaintiff (R. at 18, 243-244).  Based on his treatment of Plaintiff from August 2000, through February 2002, the doctor opined Plaintiff could sit for eight hours in a word-day, stand for a maximum of three hours continuously during a work-day, walk for a maximum of three hours continuously during a work-day (R. at 18, 243).  Dr. Adomfeh also noted Plaintiff would need to change positions frequently to relieve pain, but did not need to lie down periodically during the work-day.  Id.  In the doctor's opinion, Plaintiff could lift and carry 20 pounds continuously, 21-25 pounds frequently, and 26-50 pounds occasionally.  Id.  Dr. Adomfeh assessed Plaintiff as capable of using his hands for repetitive movement, but noted Plaintiff should not use his feet for repetitive movement, as in pushing and pulling of leg controls (R. at 18-19, 243-244).  The doctor opined Plaintiff should not bend, squat, crawl, climb, or reach, and moderately restricted from working at unprotected heights, around moving machinery, or driving automotive equipment (R. at 19, 244).

In August 2002, Dr. Adomfeh completed another Physical Capacities evaluation for Plaintiff (R. at 361-362).  While most of the restrictions were similar to the February 2002 evaluation, Dr. Adomfeh further restricted Plaintiff from using his hands for repetitive action such as simple grasping, pushing and pulling of arm controls, and fine manipulation with his fingers (R. at 361).  The ALJ discounted this later evaluation as the record, including reports of numerous visits with Dr. Adomfeh, contained no objective

evidence to support Plaintiff's claim of significant pain and limitations in his shoulders, arms, or hands (R. at 20, 243-244, 257-259, 265, 266, 268-270, 270-271, 272-273, 353-354, 355-356, 356-358, 361-362, 407-408, 420).

Thus, contrary to Plaintiff's assertion that the ALJ disregarded the opinion of Plaintiff's treating physician, Dr. Adomfeh, it is clear from the record that the ALJ gave significant weight to the opinions of Dr. Adomfeh that were consistent with Plaintiff's other treating and examining physicians, but discounted the opinion that Plaintiff was restricted in using his hands for repetitive movement, as such a restriction was inconsistent with the evidence of record.

Based on the foregoing, this Court finds that it was not improper for the ALJ to have afforded significant weight to the opinions and evaluations of Dr. Adomfeh, but to ultimately predicate his disability determination on the objective medical results, and the medical opinions consistent with those results, contained in the record.  It is the sole responsibility of the ALJ to weigh all medical evidence and resolve any material conflicts in the record. See Richardson v. Perales, 402 U.S. 389, 399, 91 S. Ct. 1420, 1426, 28 L. Ed. 2d 842 (1971).  Under the circumstances presented in this case, it cannot be said that the ALJ disregarded the medical evidence from Plaintiff's treating physician, and instead substituted his lay opinion for the opinion of a medical professional.  Rather, in determining Plaintiff's residual functional capacity, this Court finds that the ALJ afforded significant weight to Dr. Adomfeh's February 2002 evaluation of Plaintiff's physical capacities, and less weight Dr.

Adomfeh's August 2002 evaluation, as the latter evaluation is not supported by the evidence of record.

### The ALJ Failed to Consider Plaintiff's Pain and Subjective Symptoms Testimony:

12.     Plaintiff's third allegation is that the ALJ failed to consider Plaintiff's pain and subjective symptoms testimony in determining Plaintiff was not disabled under the Act.  As an example, Plaintiff claimed that because of pain, he was limited in his ability to perform tasks that required reaching, and also unable to perform tasks that required gross and fine manipulation of his hands and wrists.  See Plaintiff's Brief, p. 15.  Plaintiff also claimed his medications made him drowsy, and caused lapses in his concentration.  Id. Further, Plaintiff asserted he could sit for only 30 minutes before he had to change position for at least five minutes.  Id.  The ALJ considered Plaintiff's testimony regarding his pain and symptoms, weighed the testimony against the objective medical evidence, and found that while Plaintiff's testimony was generally credible, it did not support a basis for a finding of disability within the meaning of the Act (R. at 20).

Courts in the Second Circuit have determined pain is an important element in DIB and SSI claims, and pain evidence must be thoroughly considered.  See Ber v. Celebrezze, 333 F.2d 923 (2d Cir. 1994).  Further, if an ALJ rejects a claimant's testimony of pain and limitations, he or she must be explicit in the reasons for rejecting the testimony.  See Brandon v. Bowen, 666 F. Supp. 604, 609 (S.D.N.Y. 1997).

However, subjective symptomatology by itself cannot be the basis for a finding of disability.  A claimant must present medical evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptomatology alleged.  See 42 U.S.C. §§ 423(d)(5)(A), 1382c (a)(3)(A); 20 C.F.R. §§ 404.1529 (b), 416.929; SSR 96-7p; Gernavage v. Shalala, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995).  In this case, there is no question Plaintiff suffers from a severe musculoskeletal impairment secondary to osteoarthritis and gout, but his reported subjective symptoms suggest a greater restriction of function than would be indicated by the medical evidence in the record.  Plaintiff's objective signs and symptoms of his impairment were not so marked as to render him totally disabled for the purposes of the Act.  Thus, the ALJ considered Plaintiff's daily activities, the type and nature of the symptoms reported, the medication and other treatment Plaintiff used to alleviate his symptoms, and any other measures he used to relieve pain (R. at 12-17).  See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p.  The ALJ's decision shows he reviewed Plaintiff's complaints of pain and other symptoms, but found the medical and other evidence did not corroborate Plaintiff's claim of disabling pain and other limitations (R. at 15-20).

As an example, the ALJ assessed Plaintiff had some limitations because of his chronic pain and other symptoms, including drowsiness and loss of concentration, but noted "the claimant does not suffer from any condition or combination of conditions which would preclude him from

performing his past relevant work [as a social welfare examiner]" (R. at 20).

The ALJ pointed to the medical reports of Doctors Albrigo, Balagtas, Wirth,

Jorgenson, Roque, Tonneau, Adomfeh, and Lawford, that despite Plaintiff's

subjective complaints, revealed little in the way of objective findings (R. at 15-

19).

      The ALJ also provided an explicit summary of Plaintiff's testimony

concerning his activities of daily living (R. at 19).  Plaintiff testified he lives

with his elderly invalid mother in her home and is her full-time caregiver (R. at

19, 463).  He reported he put drops in her eyes, bathed her feet, escorted her

to regular doctor and hairdresser appointments, and took her out to

restaurants for meals (R. at 19, 463-464).  Plaintiff testified he did the laundry

and the grocery shopping.  Id.  He also testified that he drove an automobile

on a daily basis to attend regular AA meetings (R. at 19, 463).  This

information was corroborated in office notes prepared by Doctors Balagtas,

Le, Adomfeh, and Blaber (R. at 124, 137, 168, 272, 412).  In his Adult

Function Report prepared on September 27, 1998, Plaintiff reported he

cooked daily and shopped weekly, watched television, read, listened to the

radio, and had regular social visits (R. at 93-94).  Such wide and varied

activities do not corroborate Plaintiff's claim of totally disabling pain and other

limitations, including excessive drowsiness.

      Further, Plaintiff told the ALJ during his first hearing on April 6,

1999, that he could work, but the USPS did not want to accommodate him

with a light duty position (R. at 446).  This information is corroborated by

reports from Dr. Thomas Lawford (R. at 210-212, 214-215, 222-223, 226, 226-228).  Plaintiff explained to the ALJ that as a condition of applying for "retirement disability" with the USPS, he was required to apply for DIB (R. at 447).  Confirmation of this statement appears in a letter to Plaintiff from the Office of Personnel Management, advising him he would not receive his annuity payments from the government until he provided evidence that he had applied for DIB (R. at 232-233).

The ALJ observed in his examination of Plaintiff's record that most of his treatments have been conservative in nature (R. at 15-19).  It is clear from the record that Dr. Albrigo recommended Plaintiff undergo arthroscopic surgery on his left knee, which the doctor reported was successful and should allow Plaintiff to return to full employment three weeks after the surgery was completed (R. at 15, 203, 204-205).  Plaintiff also reported to Doctors Jorgenson and Roque relief of pain in his shoulders with injections, physical therapy, and NSAIDS (R. at 17, 139-140, 143-145, 274-277, 279-280).  Dr. Adomfeh prescribed salsalate for pain, recommended diet and weight loss, and rated Plaintiff's pain as mild in February 2001 (R. at 243-244, 356-358).

Finally, Plaintiff's record contains varying and inconsistent information about side effects from medication.  Other than internal bleeding possibly caused by Indocin, and an episode of bleeding possibly caused by naproxen, Plaintiff's record is relatively silent about medication side effects (R. at 106, 172-173, 278-279, 279-280).  The doctors' notes do not report Plaintiff experienced serious drowsiness from his medications.  In fact, while

Dr. Adomfeh advised in the Physical Capacities Evaluations he completed for Plaintiff that Plaintiff should not be around moving machinery or drive automotive equipment because he was taking Flexeril, Plaintiff reported that he drove an automobile daily to attend AA meetings, went to restaurants, shop, and went to doctors' appointments (R. at 463-464).

In sum, the Court finds the ALJ properly considered Plaintiff's pain and symptomatology, along with the medical and other evidence in the record, and the totality of evidence does not substantiate Plaintiff's claim that his pain and other symptoms were disabling.  Accordingly, the ALJ exercised his discretion to evaluate the credibility of Plaintiff's testimony, presented an explicit summary of his evaluation, and rendered an independent judgment regarding the extent of Plaintiff's subjective complaints based on the objective medical and other evidence (R. at 25).  See e.g. Mimms v. Sec'y of Health and Human Servs., 750 F.2d 180, 196 (2d Cir. 1984).

**The ALJ Improperly Concluded that Plaintiff Retained the Residual Functional Capacity to Perform Work at Either the Light or Sedentary Work Levels:**

13.    Plaintiff's fourth challenge is that the ALJ improperly concluded he retained the residual functional capacity to perform alternative work at either the light or sedentary work levels.  See Plaintiff's Brief, pp. 8-12.  While it is unclear from Plaintiff's brief, his challenge appears to have three prongs. First, he claims the ALJ's finding that Plaintiff can perform a full range of light work activity is not supported by substantial evidence.  See Plaintiff's Brief, pp .1-12.  Second, Plaintiff claims the ALJ failed to recognize that, because of his

exertional and non-exertional limitations, the sedentary occupational base would be so significantly eroded that under the guidelines of SSR 96-9p, a finding of disability would be required.  See Plaintiff's Brief, p. 8-9.  Third, while Plaintiff does not make the explicit claim in his brief, it appears to the Court that he challenges the ALJ's finding that he retains the residual functional capacity to perform his past relevant sedentary work as a social welfare examiner.

The Court dismisses Plaintiff's contention that the ALJ found Plaintiff could perform the full range of light work.  See Plaintiff's Brief, pp. 10-12.  While the ALJ proposed Plaintiff could perform a wide range of light to sedentary work, the ALJ was very specific with respect to Plaintiff's exertional and nonexertional limitations, and clearly spelled out Plaintiff's work restrictions in his decision (R. at 20-21).  Thus, it is clear the ALJ did not suggest in his decision that Plaintiff could perform the full range of light work.

Further, the Court dismisses Plaintiff's contention that the ALJ failed to explore the erosion of the base of sedentary work available to Plaintiff because of his exertional and nonexertional impairments.  See Plaintiff's Brief, pp. 8-9.  Based on the evidence of record, the ALJ found Plaintiff could return to his past relevant employment as a social welfare examiner; thus, an exploration of Plaintiff's potential work opportunities at the sedentary work level was unnecessary (R. at 20-21). See Title 20 CFR §404.1520(f), §404.1560(b); SSR 86.8, 86-61.

Plaintiff misunderstands the shifting of the burden at the fourth step of the sequential evaluation.  As noted above, the Commissioner has established a five-step sequential evaluation process to determine whether a claimant is disabled as defined under the Act.  See 20 C.F.R. § 404.1520, 416.920.  The United States Supreme Court recognized this as the correct approach to analyzing disability claims in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987).   This approach remains the standard for determining if a claimant is disabled under the Act.

The proper sequence of the analysis is set forth in section 9 above.  However, Plaintiff suggests the ALJ erred at step four of the sequential evaluation, and vaguely argues the ALJ ignored the vocational expert's testimony that Plaintiff's exertional and nonexertional limitations would preclude him from returning to his sedentary skilled past relevant employment as a social welfare examiner, and also that Plaintiff could perform the full range of light work.  See  Plaintiff's Brief, pp. 8-9, 10-12.  Plaintiff is incorrect with respect to both suggestions.  For the burden to shift to the Commissioner at the conclusion of the analysis of step four of the five-step sequence, the Plaintiff must prove he or she cannot return to any past relevant employment performed during the past 15 years, and performed for a long enough period of time for the Plaintiff to have learned how to do the work.   See 20 C.F.R. § 404.1560(b)(1).

In this matter, at step three of the evaluation, the ALJ found Plaintiff had severe musculoskeletal impairments secondary to gout and osteoarthritis

(R. at 15).  The ALJ engaged the services of a vocational expert to explore Plaintiff's employment options, given his medical problems, as well as his age, education, and prior work experience (R. at 483-515).   Based on the extensive medical and testimonial evidence in this case, and the testimony of a vocational expert, the ALJ determined at step four of the sequential evaluation that Plaintiff retained the residual functional capacity to return to his past relevant sedentary employment as a social welfare examiner (R. at 21).

As required by SSR 86-8, the ALJ performed his duty with respect to carefully considering whether Plaintiff could perform his past relevant work. He examined Plaintiff's medical evidence, and Plaintiff's reported symptoms, limitations, and activities of daily living, as well as Plaintiff's age, education, and training.  Along with this information, the ALJ considered the testimony of a vocational expert, and determined Plaintiff could not perform his past relevant medium work as a USPS machine maintenance mechanic (R. at 18-21).  However, based on the available evidence, the ALJ found Plaintiff could engage in his past relevant sedentary and skilled employment as a social welfare examiner, as Plaintiff retained the capacity to perform the particular functional demands of the job both as he actually performed it, and as the job would ordinarily be performed in the national economy (R. at 20-21, 493-510). See SSR 82-61.  Thus, because Plaintiff could return to his past relevant employment, the burden did not shift to the Commissioner at step four of the sequential evaluation.  See 20 C.F.R 404 § 1560(b); see also SSR 86-8.

Contrary to Plaintiff's assertion, the Commissioner was not required to demonstrate that there was alternative work available to Plaintiff existing in significant numbers in the national and local economies.  See 20 C.F.R  404 § 1560(c); see also SSR 86-8.

Thus, based on the medical evidence, Plaintiff's written and oral testimony, and the testimony of the vocational expert, the Court finds the ALJ properly concluded Plaintiff could return to his past relevant work as a social welfare examiner.

## Conclusion

14.    After carefully examining the administrative record, the Court finds substantial evidence supports the ALJ's decision in this case, including the objective medical evidence and supported medical opinions.  It is clear to the Court that the ALJ thoroughly examined the record, afforded appropriate weight to all the medical evidence, including Plaintiff's treating physicians, and consultative examiners, and afforded Plaintiff's subjective claims of pain and limitations an appropriate weight when rendering his decision that Plaintiff is not disabled.  The Court finds no reversible error, and further finds that substantial evidence supports the ALJ's decision. Accordingly, the Court grants Defendant's Motion for Judgment on the Pleadings and denies Plaintiff's motion seeking the same.

IT IS HEREBY ORDERED, that Defendant's Motion for Judgment on the Pleadings is GRANTED.

FURTHER, that Plaintiff's Motion for Judgment on the Pleadings is denied.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.

SO ORDERED.

Dated:  May 13, 2008
          Syracuse, New York

Victor E. Bianchini
United States Magistrate Judge